UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARK MOE, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>           -against-<br><br>THE HOTCHKISS SCHOOL,<br><br>    Defendant. | Civil Action No.:  3:23-cv-1460<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## <u>INTRODUCTION</u>

1.      The Hotchkiss School ("Hotchkiss") is a private boarding school in Lakeville, Connecticut. As a school, particularly a boarding school, Hotchkiss had a duty to protect the children in its care. Parents and students relied on Hotchkiss and its faculty and administrators to honor that duty and protect its students from unreasonable risks of harm, including sexual abuse.

2.      Hotchkiss betrayed that trust. Instead of ensuring a safe and secure community, Hotchkiss fostered an environment rife with abuse. Rampant sexual abuse of boys and girls by faculty was widely known by students, faculty, and administrators. The school permitted known sexual abusers to remain on its staff and faculty for decades, and indeed protected them. The School's highest priority was to protect its reputation over all else—not the safety of the children in its care.

3.      Plaintiff Mark Moe is one of those former students who was sexually abused as a minor by his Hotchkiss teacher Roy G. Smith, Jr., after Hotchkiss knew and should have known had that Smith had drugged, raped, and otherwise sexually abused other students. Hotchkiss knew and should have known of Smith's clear and consistent patterns of abusive behavior. As

-1-

the "official" trainer in the boys' locker room (despite having no such training or qualifications),
Smith regularly touched boys' groin and genital areas inappropriately under the guise of
treatment, often in open view of faculty, coaches, and other students.

4.    As an English teacher and "dorm parent" who lived on and had authority over one
floor of a boys' dormitory, Smith regularly required boys to come for "tutoring" to his dormitory
apartment, where he sexually abused them, including by drugging and raping them. Former
Hotchkiss students who suffered abuse by Smith describe these patterns of abuse in remarkably
similar terms, even when these survivors attended Hotchkiss decades apart. Hotchkiss never
intervened for 30 years, all while continuing to provide Smith with access to and power over
scores of boys in Hotchkiss's care.

5.    Smith's inappropriate behavior was widely known on campus. The Hotchkiss
Headmaster received a direct report of Smith drugging and raping a student in 1987. Instead of
disciplining Smith or protecting its students, Hotchkiss expelled the student who reported Smith
and continued to employ Smith in the same positions for the next 13 years.

6.    As Plaintiff's athletic trainer and English teacher, Smith abused Plaintiff through
both of his standard methods: Smith inappropriately touched Plaintiff's genitals regularly before
sports, and Smith lured Plaintiff to his apartment under the pretense of English tutoring and then
sexually abused him. These horrifying acts and others were inflicted on school property, during
the school year, and under the noses of the School's teachers and administrators.

7.    Hotchkiss allowed Smith's direct abuse to occur and failed to institute policies
and procedures for the prevention of and response to sexual abuse. This type of "institutional
betrayal" exacerbates and amplifies the trauma of the direct abuse.

8.      Plaintiff, individually and on behalf of all male Hotchkiss students who were student-athletes on a Hotchkiss sports team for which Roy Smith served as an athletic trainer, and/or who visited Roy Smith's on-campus apartment for "tutoring," brings this class action to hold Hotchkiss accountable for exposing him and other Hotchkiss students to the increased danger of sexual violence posed by Roy Smith, and to the sexual violence that ultimately occurred. By this class action, Plaintiff seeks to shine a light on these and similar traumatic events to force Hotchkiss to acknowledge the deep wrongs done to himself and Class members.

9.      In a prior case by a different survivor of abuse by Roy Smith at Hotchkiss, this Court found sufficient evidence that a reasonable jury could find that Hotchkiss knew or should have known that its failure to take precautions against sexual abuse would expose its students to a greater risk of harm. *Doe v. Hotchkiss Sch.*, No. 3:15-CV-160 (VAB), 2019 WL 1099027, at *12 (D. Conn. Mar. 8, 2019) (denying motion for summary judgment); *Doe v. Hotchkiss Sch.*, No. 3:15-CV-160 (VAB), 2019 WL 3302203, at *3 (D. Conn. July 23, 2019) (denying motion for reconsideration). The evidence Plaintiff will present here will similarly show that Hotchkiss breached its duties to Plaintiff and the proposed class of former students, causing Plaintiff and other survivors great harm that continues to affect them today.

10.      In 2018, Hotchkiss published a report it commissioned describing a stunning amount of serial sexual abuse by Hotchkiss faculty against its students. *See* Ex. A, Report to the Board of Trustees of The Hotchkiss School, prepared by Locke Lord (August 2018) (the "Locke Lord Report" or the "Report"). Although the Locke Lord Report purposely excluded reports of abuse by Roy Smith,[1] it details abuse by many other faculty during the same decades Smith was

---

[1] Hotchkiss admitted in its own court filings that *"Roy Smith was beyond the scope of the Carlton Fields investigation." Hotchkiss v. Doe*, Case No. 3:18-mc-00037-VAB [Dkt. 23] at 9

also abusing children at Hotchkiss. The Report makes clear that Hotchkiss actually knew and should have known of the risk of faculty members abusing students during Smith's tenure, especially when Hotchkiss allowed students to be alone with teachers in faculty apartments. The Report also reveals the culture around sexual abuse at Hotchkiss during Smith's tenure—one where predatory teachers were accepted and protected, while student reports were suppressed.

11.     Through this lawsuit, Plaintiff seeks compensation for the harm he suffered and continues to suffer from Hotchkiss allowing Roy Smith to abuse him when he was a child in Hotchkiss's care. Plaintiff also seeks to represent an issues class to prove that Hotchkiss owed and breached a duty to all alumni that Hotchkiss allowed Roy Smith to prey upon in the locker room and in Smith's apartment.

## II.     <u>JURISDICTION AND VENUE</u>

12.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action filed under Rule 23 of the Federal Rules of Civil Procedure, including claims asserted on behalf of a class with members who are citizens of different states than the defendant (including Plaintiff Mark Moe). There are likely well over 100 proposed Class members throughout the country, and the aggregate amount in controversy exceeds the jurisdictional amount of $5,000,000.00.

---

(Carlton Fields initiated the investigation that Locke Lord relied on and continued to prepare the Locke Lord Report). And it is clear from the experiences of alumni who contacted the prior investigators at Carlton Fields that the investigators' actual practice was to exclude any potential report concerning Roy Smith from the investigation. *See Hotchkiss v. Doe*, Case No. 3:18-mc-00037-VAB [Dkt. 22] at 4. Carlton Field was fired and replaced with Locke Lord only after Hotchkiss alumni demanded it be fired after discovering a conflict that would prevent Carlton Fields from being unbiased and independent.School-sponsored investigations like the one conducted by Carlton Fields and Locke Lord have received criticism for not being sufficiently independent to gather complete information or accurately assess the sponsoring school. *See* https://www.nytimes.com/2017/09/28/nyregion/lawyers-prep-school-sexual-abuse.html

13.     This Court also has subject matter jurisdiction over individual claims brought by Plaintiff Mark Moe based on the diversity of the parties pursuant to 28 U.S.C. § 1332(a). Hotchkiss is headquartered, incorporated, and operates its principal places of business in the State of Connecticut. Plaintiff Mark Moe is a citizen of Florida. The amount in controversy, without interest and costs, exceeds $75,000.

14.     Venue is proper in this District under 28 U.S.C. § 1391(a)–(d) because, *inter alia*, a substantial parts of the events or omissions giving rise to the claim occurred in the District and/or a substantial part of property that is the subject of the action is situated in the District.

## III.     PARTIES

### A.     Plaintiff

15.     Plaintiff Mark Moe resides in and is a citizen of the State of Florida.

### B.     Defendant

16.     Defendant Hotchkiss is a non-stock corporation formed pursuant to the laws of the State of Connecticut with its principal place of business in the State of Connecticut.

17.     Hotchkiss, founded in 1891, is a private college-preparatory boarding school for grades nine through 12, located in Lakeville, Connecticut.

## IV.     FACTUAL ALLEGATIONS

### A.     Hotchkiss Had a Duty to Protect the Children in Its Care.

18.     Hotchkiss is a school. Parents entrust their minor children to its care, *in loco parentis*. This is the case for day schools, but it is even more so for boarding schools, where children live and sleep for the majority of their school years. The boarding school is therefore responsible not only for the children's education, but also their safety, their protection, and their

-5-

physical and emotional well-being, both during the school day and during evenings and

weekends when they remain on campus or otherwise in the school's care.

19.     For this reason, this Court recognized in a prior case about abuse by Roy Smith

that, as a matter of law, Hotchkiss had an affirmative duty to its students to warn about and

protect against the risk of sexual abuse by teachers. *See Doe v. Hotchkiss Sch.*, No. 3:15-CV-160

(VAB), 2019 WL 1099027, at *6-7 (D. Conn. Mar. 8, 2019); *see id.* at *16 (recognizing

Hotchkiss's "dominant position" over its students).

20.     Hotchkiss administrators and faculty understood this was their duty. *Id.* at *8.

Former Headmaster Arthur White used to say on the first day of school, addressing students and

parents: "Parents, your job is to leave." In other words, the education, health, and safety of your

children is Hotchkiss's duty now. Hotchkiss administrators have acknowledged under oath that

schools are entrusted with the safety and well-being of their students.

21.     Since 1967, Connecticut state law has mandated that a teacher who has a

"reasonable cause to suspect or believe" that a child under the age of 18 has suffered abuse,

which is defined to include "a condition that is the result of maltreatment, including, but not

limited to . . . sexual molestation or exploitation" is required to report the suspected abuse to law

enforcement.[2] The District of Connecticut concluded that "[a]s an institution, Hotchkiss arguably

failed to comply with state reporting requirements and investigate allegations of sexual abuse

when they were reported to administrators. *Doe v. Hotchkiss Sch.*, No. 3:15-CV-160 (VAB),

2019 WL 1099027, at *9 (D. Conn. Mar. 8, 2019).

---

[2] Conn. Gen. Stat. §§ 17a-101, 17a-101a through 17-101d, 46b-120.

22.     In sum, Hotchkiss owed a duty to Plaintiff, proposed class members, and all its other students to prioritize their health and welfare and to protect them from sexual abuse—especially from the School's employees, the faculty and coaches who Hotchkiss gave access to and power over its students.

23.     As detailed below, Hotchkiss did not honor this duty. Instead, Plaintiff and other students faced repeated betrayal and emotional abuse, along with inappropriate and unlawful boundary-crossing by many teachers entrusted to care for the students. By creating and protecting a culture of cover-up throughout its community, the School made clear that if something inappropriate occurred, both children and employees could suffer severe retaliatory consequences if any misconduct was reported to anyone outside the School, thereby protecting the School's reputation and the predators it harbored.

**B.      Hotchkiss Was Well Aware that Roy Smith and Other Faculty Posed Ongoing Threats to, and in Fact Repeatedly Abused, Its Minor Students.**

24.     Since at least the 1970s, Hotchkiss knew that Smith and other teachers regularly committed sexual abuse against Hotchkiss students, including minors, from a combination of direct reports to Hotchkiss leaders and public acts by the abusers that made their conduct common knowledge on campus.

25.     In a prior lawsuit alleging that Smith drugged and raped a student in 1987, the District of Connecticut concluded that the plaintiff "presented evidence that Hotchkiss was aware of instances of sexual abuse at the school in the years preceding his enrollment, and while he attended the school." *Doe v. Hotchkiss Sch.*, No. 3:15-CV-160 (VAB), 2019 WL 1099027, at *9 (D. Conn. Mar. 8, 2019).

26.     As described below, Hotchkiss in fact knew and/or should have known of abuse by Smith and other faculty going back to the 1970s and continuing throughout Smith's tenure.

> **1.     Hotchkiss Knew and Should Have Known of Roy Smith's Pattern of Abuse.**

> **a.     Roy Smith's Campus Reputation**

27.     Roy Smith taught at Hotchkiss from 1970 through 2000.

28.     Roy Smith exhibited classic predatory and grooming behavior, out in the open, visible to any and all.

29.     Smith has been consistently described by former students and faculty as especially touchy-feely and "hands on"—often uncomfortably so—and unusually physical and openly affectionate with boy students. Smith would often roughhouse and wrestle with male students, pat, pinch, or slap them on the buttocks, and hug and hold them for a long time. In addition to constantly touching students, Smith would also call them pet names and inappropriately compliment their appearance, such as "beautiful" and "adorable boy."

30.     Former teachers remember that Smith almost always initiated uncomfortable physical contact at every interaction—on the neck, the small of the back, etc. This was true with students and other faculty, and administrators knew it. Smith's inappropriate, sexualized behavior was common knowledge, the subject of frequent public comment, and an accepted part of Hotchkiss. He got away with it in broad daylight.

31.     Smith's public touchiness was a grooming method. By regularly touching and embracing students, including in sensitive areas like the buttocks, Smith was systematically shifting students' (and adults') expectations of appropriateness and level of perceived familiarity and intimacy with Smith. Smith also differentiated himself from the many faculty, especially in the 1970s and 1980s, who acted authoritarian and were very tough on the kids. Smith, by

contrast, made himself accessible, friendly, and comforting, giving kids hugs. He had them call him "Uncle" or "Uncle Roy." All this public behavior made it easier for Smith to grope students in the training room and lure students to his apartment to molest them in private.

32.     In Hotchkiss's 1988 yearbook ("*Mischianza*"), one student wrote in his published yearbook quote: "Virgin Roy, you promiscuous homosexual, make sure you keep your hands off those little boys."

> **b.**     **Roy Smith Exploited His Role as Athletic Trainer to Abuse Boys in the Locker Room.**

33.     Shortly after being hired as a faculty member in Hotchkiss's English department, Smith also volunteered to serve as the athletic trainer for multiple boys' sports teams, including the football and hockey teams.

34.     Despite having zero athletic background and no experience, education, or credentials in athletic training or medical care, Smith served as the School's *only* athletic trainer for the next 15 years (and continued to serve in that fake trainer role alongside more qualified, credentialed trainers until his departure from the School in 2000).

35.     In his role as athletic trainer, Smith had responsibility for preparing student-athletes before and after every practice and game, primarily by massaging, taping up, and wrapping with bandages students' muscles. Smith also unofficially prescribed and provided muscle relaxants and other pills to the students he "treated" as an athletic trainer. Smith had no medical license or legal authority to prescribe medication. In Hotchkiss's 1984 *Mischianza* school yearbook, a student noted: "[Smith] prescribes aspirin and ice with the confidence of a Mass. General physician"[3] even though he had no medical credentials.

---

[3] Hotchkiss 1984 *Mischianza* school yearbook, p. 4.

36.     Smith held significant power over students as the athletic trainer. Students at Hotchkiss were required to participate in an extracurricular, and many chose sports, which were a big deal on campus. Before practicing or playing, many student-athletes were *required* by their Hotchkiss team coaches (themselves Hotchkiss faculty members) to visit Smith for so-called training. Smith might touch a dozen students before and after each practice and game. In particular, injured students were required to let Smith tape their injured body parts (ankles, hips, etc.) before being allowed to play. There was thus a strong incentive on student-athletes not to complain or resist Smith's inappropriate touching to ensure they could play. Smith was also responsible for driving students to away games off campus.

37.     Hotchkiss even permitted Smith to make decisions about whether students were medically fit to play, despite his lack of any medical training. In at least one instance, Smith examined an injured student, failed to identify a fractured ankle, and said the student could play hockey. Smith was wrong. The student suffered brutal pain and had to go to the hospital.

38.     For his 30 years as athletic trainer at Hotchkiss, Smith consistently exploited his power over student-athletes to sexually abuse them. Smith "treated" students in a room he occupied attached to the boys' locker room. Smith's training room had no door, which meant he could see directly into the locker room, including while the boys changed. Alumni have described Smith as a constant, daily presence in the boys' locker room where he was given the run of the place. Meanwhile, students, including underage boys, had to shower and change without any privacy from Smith's leering gaze. In effect, Hotchkiss forced every male student on a sports team for which Smith served as "trainer" to regularly display their nude underage bodies to Smith and then to be inappropriately touched by him.

-10-

39.     Multiple student-athletes abused by Smith have described the same conduct Smith committed again and again over the decades, from the 1970s through the 1990s. Student-athletes would enter Smith's training room, which was adjacent to the boys' open showers (with multiple shower heads and no privacy) and locker room. In Smith's training room there was a medical table where the students would sit or lie while Smith massaged, wrapped, and taped them. Smith would do this while students wore little or no clothing, such as a towel or compression shorts. Even when the students' injuries that Smith was ostensibly treating were elsewhere, such as their ankles, Smith would quickly move his hands to massage (grope) the students' inner thighs in a sexual manner. Smith would ask suggestive and sexually harassing questions like: "Child, how do you like it here?" Once his massage or taping approached students' genitals, Smith would brush his hand against students' penises and testicles through their shorts, pretending it was incidental. Sometimes, Smith moved his face close enough to brush it against students' genitals, again pretending it was accidental. Other times, Smith pressed his own genitals against students while taping them.

40.     The way Smith inappropriately touched the student-athletes was no secret. Students said Smith was widely "known to cop a feel" while taping you up. There was no door to Smith's "treatment" room, so students, coaches, and anyone else who visited the locker room could see the way Smith touched students. Faculty have said Smith's enthusiasm for rubbing students made it clear it was not medical in nature, and that you could tell the students were like prey for him in his athletic room. The faculty coaches knew or should have known of Smith's behavior, including football coach and Director of Athletics Rick DelPrete, and assistant football coach Damon White (son of former Headmaster Arthur White). (Both of these coaches were

-11-

themselves found to have been credibly accused of sexual abuse against students, described in more detail below.)

41.     Although the Locke Lord Report specifically excluded reports of abuse by Smith, it states that "Multiple graduates reported that a faculty member, who performed athletic training duties, would touch students in inappropriate ways that were unrelated to treatment."[4] This describes in general terms how Smith acted against Plaintiff and other members of the proposed Class.

### c.      Roy Smith Exploited His Role as English Teacher to Abuse Boys in His On-Campus Dormitory Apartment.

42.     Smith's primary role at Hotchkiss was as a faculty member of the English department. As with his role as athletic trainer, Smith exploited his power over students to sexually abuse them. Again, Hotchkiss knew and should have known of Smith's recurring abuse but did nothing to limit his access to students for decades.

43.     Smith, like many other faculty, resided in an apartment in a student dormitory. Unlike other faculty, Smith chose to live in a boys' dormitory for his entire three-decade career, despite the fact that his tenure entitled him to one of the large, beautiful, private on-campus houses provided for senior faculty.

44.     Dorms were run by faculty designated as dorm heads or "dorm parents" (further emphasizing the *in loco parentis* role of Hotchkiss and its faculty). Hotchkiss designated Roy Smith as dorm head after he had raped multiple students in his dorm apartment. Each dorm was the dorm head's fiefdom, and dorm heads were free to run the dorm however they wished. There were no rules or guidelines from the administration to faculty on how to run the dorms. This, too,

---

[4] Ex. A, Locke Lord Report, at 25.

-12-

allowed predators like Smith access to children at all hours and ample opportunity to groom and

abuse children in their own homes. Displaying classic predatory behavior, Smith capitalized on

this access and opportunity.

45.     As with Smith's pattern of consistent behavior in the locker room, alumni from

the 1970s, 1980s, and 1990s describe with chilling similarity how Smith lured them to supposed

tutoring sessions alone in his on-campus apartment at night before inappropriately touching

them, flirting with them, and, for many, molesting them or worse.

46.     Smith's behavior was consistent. First, Smith would choose students to target in

his English class (or sometimes other students he met on campus). These would often be students

Smith could tell were extra vulnerable, for example if they appeared not to fit in with other kids,

had recently transferred, seemed lonely, looking for a parental figure, or came from less affluent

backgrounds than most Hotchkiss students. Next, Smith encouraged these students to come to his

apartment for evening hours in order for Smith to provide special individualized "assistance"

with their school work. Often Smith did more than encourage students—he would intentionally

give them poor grades on papers, regardless of their quality, and instruct them that they had to

attend private tutoring with him to improve their grades. Such tutoring was one on one in

Smith's on-campus apartment at night, with the door closed.

47.     Once Smith had successfully brought a student into his apartment, his conduct

followed a consistent pattern. Smith would have the students sit on his couch, close the door, and

sit extremely close to them on the couch. Multiple survivors have described Smith sitting

unusually and uncomfortably close to them while reviewing their papers, such that their bodies

would be touching even though there was plenty of room to spread out on the couch. Smith

would inevitably place his hands on the students, typically starting with their legs and back.

-13-

Sometimes Smith would use multiple "tutoring" sessions to progressively ramp up his misconduct and test the vulnerability of the targeted child—classic grooming behavior. Multiple survivors remember Smith eventually offering them something to drink, drinking it, and then having their memories go black. Some remember feeling dizzy before the blackness. While some survivors still cannot recall what happened after blacking out, others remember coming to either in the middle of Smith anally raping them on his couch, or waking up afterward half-dressed. Smith's abuse would leave survivors traumatized in their formative years, and affected for the rest of their lives. As is the case with many survivors of childhood sexual abuse—especially male survivors—many of the Hotchkiss alumni have carried the scars of Smith's abuse silently throughout their life, believing it to be a shameful secret that only happened to them. In truth, they were not alone, because Hotchkiss gave Smith access, opportunity, and protection to molest children over and over again for 30 years.

48.     The fact that students were often left alone with Smith in his private residence at night was well-known, accepted, and protected by the School's administration. Other faculty described Smith as having a stream of kids in and out of his apartment most nights, and that this was common knowledge. Indeed, the school's 1984 yearbook stated that "At night, he retires to his apartment to discuss papers with students."

49.     Students who lived in Smith's dorm have stated that Smith not only advised boys on their work in his apartment at night, but also watched movies with them and frequently discussed sexual topics.

50.     Hotchkiss was on notice of Smith's predatory nature not only because of his open conduct but also because of direct reporting to Hotchkiss administrators about Smith's abuse. For example, a student in 1987 wrote an article intended for the student newspaper, discussing the

-14-

2756010.10

failure of the School's mental health counselors, faculty, and administrators to respond appropriately to students' complaints, including his own complaints of having been drugged and raped by "Uncle Roy" in his apartment. *See* *Doe v. Hotchkiss Sch.*, No. 3:15-CV-160 (VAB), 2019 WL 1099027, at *10-11 (D. Conn. Mar. 8, 2019). That student gave a copy of the proposed article to then-Headmaster Arthur White. *Id.* White took no steps to protect that student and other vulnerable children from further assaults by Smith, and took no steps to hold Smith accountable for raping a young boy. Instead, the Headmaster forbade the student from publishing the article, and he conspired to prevent the student from informing other students, their parents, and the School community about Smith's sexual assault and his predatory propensities and behavior. Among other wrongful acts in furtherance of his efforts to hide the rape and to bury Smith's history of sexually molesting young boys at the school, White threatened to tell the student's parents that the student was homosexual if he complained publicly about the rape. White failed to report the child abuse to police as required by Connecticut law. Only weeks later, Hotchkiss expelled the student allegedly for smoking marijuana. (Hotchkiss also expelled at least one other student, allegedly for marijuana, after receiving a report that a different faculty member had raped that student.)

51.    Accounts gathered by a Hotchkiss alumni victims group include the reports of at least 12 alumni from Hotchkiss classes of 1974-84 who described incidents of inappropriate and abusive sexual behavior by Roy Smith against students, with at least one of these incidents reported to Hotchkiss as early as 1977.

-15-

## 2.   Hotchkiss Knew and Should Have Known Students Were at Risk of Faculty Abuse Throughout Smith's Tenure.

52.    Hotchkiss's knowledge of the risk that someone in Smith's position might pose a risk to students must also be viewed in the context of Hotchkiss's knowledge of frequent abuse by other faculty during Smith's tenure. Hotchkiss had extensive knowledge that many of its faculty regularly and for decades sexually abused children in its care. Hotchkiss knew that many such abusers were in the English department, assisted with student sports teams, and/or served as "dorm parents" and lived in dormitory apartments—like Smith. And Hotchkiss knew that a key avenue by which teachers accessed students for abuse was by bringing students alone to their on-campus or near-campus residences—like Smith. Yet Hotchkiss took no steps to prevent these abuses or to change the culture allowing this widespread faculty abuse. Instead, Hotchkiss prioritized protecting its own reputation and its faculty rather than its students.

53.    As the District of Connecticut summarized in a previous case, evidence shows that Hotchkiss knew about sexual abuse, tolerated sexual abuse, created a culture of protecting abusers, and failed to act when teachers reported sexual assault of students by teachers. *Doe v. Hotchkiss Sch.*, No. 3:15-CV-160 (VAB), 2019 WL 1099027, at *13 (D. Conn. Mar. 8, 2019). Specifically, the *Doe* court found that Hotchkiss was aware of sexual abuse by faculty at the school in the years preceding that student's enrollment in the mid-1970s. *Id.* at *9.

54.    The 2018 Locke Lord Report—though it was limited and failed to address Smith—described substantiated allegations of abuse against more than seven former faculty members relating to sixteen former students (plus more than a dozen additional reports the Report described in less detail), occurring from 1962 to the 2010s, primarily in the 1970s and 1980s during the early part of Smith's tenure. The Locke Lord Report reveals that Hotchkiss

-16-

leadership learned from many sources—students, parents, and faculty—that it was allowing faculty to repeatedly commit sexual abuse against its students. These urgent warnings were reported to many different Headmasters and other Hotchkiss leaders about many abusive faculty members over many years. This was not a case of one bad apple—one malevolent faculty member committing abuse or one negligent administrator ignoring it. The public evidence shows Hotchkiss had a consistent pattern of permitting abuse that was deeply embedded in its culture over the three decades that Smith taught there.

55.    As the Locke Lord Report concluded, "it is clear that Hotchkiss missed several key opportunities to protect the student body. Although not all sexual misconduct was reported contemporaneously, there were multiple reports made by survivors, other students, and faculty at or near the time of the abuse that should have spurred the school to action."[5]

56.    Hotchkiss knew—increasingly with each report—that it had a systemic problem protecting its students from sexual abuse by faculty. In the 1970s, then-Headmaster Albert "Bill" Olsen received direct reports from faculty, parents, and students about sexual harassment and sexual abuse committed by at least four teachers—Albert Sly, Lief Thorne-Thomsen, Christopher Carlisle, and George "Rick" DelPrete—including reports that these teachers were having sex with both male and female students.[6] In the 1980s, then-Headmaster Arthur White

---

[5] Ex. A, Locke Lord Report, at 26.
[6] Headmaster Olsen received and largely ignored repeated reports of Thorne-Thomsen's misconduct against multiple students, including in 1974-75, 1976-77, and 1977-79. The Locke Lord Report describes the disturbing saga of Thorne-Thomsen, who was a Hotchkiss faculty member from 1964 to 1992. Thorne-Thomsen was a Classics teacher, department chair, and cycling team coach who abused at least seven Hotchkiss students, two of whom he later married. Similar to Smith, Thorne-Thomsen repeatedly targeted vulnerable students who did not fit in, and used the trust these students placed in him as their teacher, mentor, and coach to engage in repeated sexual misconduct. And like Smith, rumors about Thorne-Thomsen's abuse were

received direct reports of abuse by Roy Smith (described above), Thorne-Thomsen, Medical

Director Peter Gott, Smokey Robinson, and a faculty member's spouse (described as "Adult 1"

in the Locke Lord Report). And in the late 1980s and early 1990s, then-Headmaster Robert

Oden, Jr. received direct reports of abuse by Thorne-Thomsen and another teacher and coach

(described as "Faculty 1" in the Locke Lord Report). Other Hotchkiss faculty also knew or

should have known of the abuse by these same teachers and others, including English teacher

and dorm parent Robert Carlson.

57.     These reports revealed systemic trends in student abuse that Hotchkiss did little to

investigate or stem. Most notably, Hotchkiss knew or should have known that students were at

risk of abuse when the school allowed faculty and students to spend time alone together,

especially at teacher residences (the same location where Smith sexually abused Plaintiff and

other students). And as a boarding school with a duty to know the whereabouts of the students in

its care, Hotchkiss should have known that its students were frequently spending time alone with

teachers, including at teacher residences on and off campus and during evening hours. The Locke

Lord Report describes many examples of such abuse occurring from the 1970s through the

1990s. Certain of those examples, as well as others, are described below.

58.     In the mid-1970s, a student reported to a faculty member and Headmaster Olsen

that history teacher and head football coach Rick DelPrete had pressured her to perform oral sex

on him at his apartment, and she had done so.[7] Afterward, DelPrete had pornographic brochures

sent to the student's school mailbox with DelPrete's address crossed out and replaced with the

---

widespread while he taught at Hotchkiss, and his misconduct was often carried out in the open
with impunity.

[7] The Locke Lord Report referred to this student as "Student 10."

student's. Olsen met with DelPrete and student, DelPrete denied the abuse and berated the student, and Hotchkiss took no corrective action. DelPrete continued to work at Hotchkiss until 2004. As football coach and Athletic Director, DelPrete oversaw Smith in his role as athletic trainer, and permitted Smith to "treat" students adjacent to the boys' showers and locker room, giving Smith regular access to and power over student-athletes for decades. DelPrete knew or should have known that Smith was abusing the student-athletes under DelPrete's supervision.

59.     Also in the mid-1970s, a faculty member found a female student alone with English teacher and dorm parent Robert Carlson in his apartment with the door locked.[8] The faculty member had interrupted Carlson and the student when they were on the floor and he was digitally penetrating her. When Carlson opened the door, the other faculty member did not seem to question the student's presence, and did not report the incident.

60.     In 1974-75, Headmaster Olsen learned of concerns about Thorne-Thomsen's behavior with students and instructed a dean to speak with Thorne-Thomsen, who rebuffed the dean. In 1976-77, a student reported to a faculty member, who reported to Headmaster Olsen and the Dean of Faculty, that Thorne-Thomsen was frequently visiting her in her dorm room with the door closed and she wanted the visits to stop.[9] After Olsen told Thorne-Thomsen to stop harassing the student at her dorm room, Thorne-Thomsen began pulling his car up in front of the student's dorm to pick her up, in open view of other students and faculty. Thorne-Thomsen would regularly bring this student to his home in the evening to study or babysit Thorne-Thomsen's children, where Thorne-Thomsen would kiss and touch her. That same year, Thorne-Thomsen took this student on a trip off-campus and they spent the night together in a motel, and

[8] The Locke Lord Report referred to this student as "Student 17."
[9] The Locke Lord Report referred to this student as "Student 2."

soon after they had sex. The student was 17 years old at the time, was very upset by what happened, and soon withdrew from Thorne-Thomsen's Latin course.[10]

61.     That was not the only student Hotchkiss allowed to regularly leave campus to visit Thorne-Thomsen at his home. That same school year (1976-77), Thorne-Thomsen often had a different student at his home, including at times when she was supposed to be in her dorm and Hotchkiss should have known she was absent. Thorne-Thomsen regularly had sex with this student, who was then only fourteen to fifteen years old—a child. The Locke Lord Report referred to this student as "Student 4."

62.     Olsen was also told by "Student 9's" parents and friends in the mid-1970s that Christopher Carlisle was obsessed with her. He was her advisor, English teacher, and band leader. He recited love poems to her in front of his entire English class, sang her love songs in front of the student band he led, came to her dorm room and sat on her bed uninvited to talk with her, and took off her off campus to hold her hand. He sent daily love letters to her school mailbox and to her home on breaks. Hotchkiss did nothing except change Student 9's advisor. As discussed below, Carlisle later had regular sex with a different student.

63.     After the repeated reports about faculty misconduct with students (if not sooner), Hotchkiss should have known that it needed to prevent teachers from being alone with students in inappropriate circumstances, especially at their residences after hours, both on and off campus. And Hotchkiss should have known its students' whereabouts. But Hotchkiss failed to protect its students.

_____

[10] Arthur White was Dean of Students in 1976 when Thorne-Thomsen was admonished for frequently visiting this student's dorm room. In 1985, when White was Headmaster, White officiated Thorne-Thomsen's marriage to this same former student at the chapel on Hotchkiss's campus.

64.     This failure by Hotchkiss enabled Smith to prey on students during these same

years. In 1976-77—the same school year when Hotchkiss learned Thorne-Thomsen was preying

on at least one student—at least one student experienced the same thing as Plaintiff Mark Moe—

being lured to Smith's apartment for tutoring, having Smith sit uncomfortably close to him on

the couch, and then having his memory go black. In fall 1978, Smith lured another student (if not

more) to his apartment for English tutoring and offered him juice. The student drank it, felt

dizzy, blacked out, and then woke up hours later naked from the waist down and able to tell he

was abused.

65.     Between 1977 and 1979, Olsen received another report by faculty of deep

concerns about Thorne-Thomsen's conduct with "Student 3."

66.     In 1979, Student 3's parent found her in a motel room alone with Thorne-

Thomsen, and wrote a letter Olsen and the Chairman of Hotchkiss's Board of Trustees. The

following month, Hotchkiss placed Thorne-Thomsen on a paid leave of absence for the rest of

the school year. Nonetheless, Hotchkiss did not prevent Thorne-Thomsen from sexually abusing

Student 4 at least twice while he was on leave for his sexual misconduct against Student 3.[11]

During this same time (1979-80), Hotchkiss failed to prevent Carlisle from having sex with

Student 4 weekly at his home. At least one additional faculty member was also regularly having

sex with a student at his apartment in the late 1970s.[12]

---

[11] In 1992, when Hotchkiss placed Thorne-Thomsen on leave *again* for sexual misconduct, Hotchkiss failed to prevent Thorne-Thomsen from coming on to campus to show up uninvited at the dorm room of yet another student ("Student 7" in the Locke Lord Report), and then to bring her in the woods on the edge of campus where he sexually abused her.

[12] The Locke Lord Report referred to these individuals as "Faculty 2" and "Student 13," respectively.

67.     Little changed in the 1980s. Hotchkiss permitted Thorne-Thomsen to return to campus the year after his (first) leave of absence. Hotchkiss continued to fail to prevent teachers from abusing students at their apartments. In the early 1980s, for example, Damon White—son of then-Headmaster Arthur White, English teacher, and coach of the football and hockey teams—repeatedly had oral sex with a student in his apartment during study hall time.[13] In the mid-1980s, Thorne-Thomsen pressured a student he coached for sex at his home, after repeatedly fondling her on campus.[14]

68.     During Headmaster Arthur White's tenure from 1983-1989, he received numerous reports of sexual abuse by several teachers without taking sufficient action to protect students.

a.      As discussed above, White suppressed a student's report that Smith had drugged and raped him in 1987, and took no action to protect future students from Smith. *See Doe v. Hotchkiss Sch.*, No. 3:15-CV-160 (VAB), 2019 WL 1099027, at *10-11 (D. Conn. Mar. 8, 2019).

b.      In the mid-80s, a 10th-grade boy told a Hotchkiss faculty member, Leslie Ramsey Stacks, that another teacher named Smokey Robinson had taken students on a trip, provided them provided them with alcohol and marijuana, encouraged them to partake, encouraged the boys to wrestle in their underwear, and then molested them, including performing oral sex on an incapacitated student. The boy provided the faculty member with several photographs of the events, including one showing Robinson with an unconscious boy's penis in his mouth. Robinson lived in the student's dorm, and he would regularly come to the student's dorm room at night and perform mutual masturbation. The student's roommate later

---

[13] The Locke Lord Report referred to this student as "Student 12."
[14] The Locke Lord Report referred to this student as "Student 5."

2756010.10

confirmed Robinson would come sit on the boy's bed at night. There were no school policies directing Stacks how to handle this situation. She went to Headmaster White and told him about the abuse and the photographs. White became very angry, asked why Stacks was talking about this, and said she needed to show her loyalty to Hotchkiss by being quiet. According to Stacks, White said: "Your first loyalty has to be to Hotchkiss. And if you tell anybody about this, I'll view this as being disloyal to Hotchkiss, and you are out of here." When she asked if they needed to talk to the school's attorneys, White said no. Stacks understood her obligations under Connecticut law and reported the incident to the police, but their investigation stalled because the Hotchkiss administration would not cooperate; instead, Hotchkiss attacked the student as a pothead. The Hotchkiss Board of Trustees became aware of the allegations. Even though the abuse was corroborated by photographs, Hotchkiss permitted Robinson to complete the school year, during which time he continued teaching, continued as assistant coach for the basketball team, and continued to live in the same dorm as the student he was abusing. Hotchkiss did nothing to protect the student. At the end of the year, Robinson was not invited back but he went with a recommendation from Hotchkiss to teach at another school. Stacks and her husband, another Hotchkiss teacher, were also not invited back, and Stacks later heard that Hotchkiss had told other schools that they were trouble, making it difficult for them to find jobs. Stacks also later heard that sexual abuse had continued in that student's dorm even after Robinson left.

        c.      A student reported to White that Medical Director Dr. Gott gave her an unnecessary gynecological exam.[15] If White had investigated, he would have found this report corroborated by faculty and many students. But after Gott told White this was proper medical

---

[15] Ex. A, Locke Lord Report, at 20.

procedure, White did not investigate further. White told Gott to have a female nurse present for future gynecological exams, but Hotchkiss apparently did not enforce this, as the Locke Lord Report catalogs abuse by Gott without nurses present through the 1990s.

          d.      White saw a student sitting on the lap of a faculty member's spouse and knew of that adult's close relationship with that student.[16]  White claimed to not know the relationship was sexual. It was.

          e.      White received two reports about Thorne-Thomsen in the late 1980s that he ignored. First, a student, her mother, and a health services worker each reported to White that Thorne-Thomsen was openly very intimate and physical with this sophomore student, hugging and kissing her after driving her home.[17] White took no action. Second, a faculty member reported to White that a student was sitting on Thorne-Thomsen's lap in the dining hall. White again took no action.[18]

        69.     In the early 1990s, a former student wrote a letter to the Dean of Faculty about abuse by a faculty member who was her adviser, teacher, and coach in the late 1980s.[19] That faculty member advised the student to come to his classroom for extra help, where he asked her to sit on his lap, tried to kiss her, and put his hand up her skirt. The Dean of Faculty merely told the faculty member to stop being so personal and physical with students and otherwise took no action.

---

[16] The Locke Lord Report referred to these individuals as "Student 19" and "Adult 1," respectively.

[17] The Locke Lord Report referred to this student as "Student 6."

[18] The Locke Lord Report referred to this student as "Student 8."

[19] The Locke Lord Report referred to these individuals as "Student 18" and "Faculty 1," respectively.

-24-

70.      In 1990 and again in 1991, then-Headmaster Robert Oden, Jr., received separate reports from Hotchkiss staff that Thorne-Thomsen was yet again being inappropriate with students. Olsen spoke with Thorne-Thomsen after both reports but believed Thorne-Thomsen's denials and did not undertake a detailed investigation or take further action. Only after Student 5 wrote Oden a letter about Thorne-Thomsen's mid-1980s abuse did Oden convene a committee to investigate further, which ultimately recommended that Thorne-Thomsen "should be helped to go elsewhere."[20] In 1992, Thorne-Thomsen was placed on another paid leave of absence (during which time he continued to come to campus to abuse Student 7), and was terminated at the end of that school year after a judge's independent investigation concluded that Thorne-Thomsen used the trust students placed in him as a teacher to sexually abuse multiple students. However, Hotchkiss made no effort to increase student safety or change its policies beyond terminating Thorne-Thomsen individually. For example, a former student tried to report abuse by DelPrete to the investigatory committee convened by Oden, but the committee was interested only in Thorne-Thomsen.

71.      Given the extensive history of Hotchkiss receiving reports of faculty sexually abusing students (including Smith), some of which Hotchkiss finally investigated and corroborated, there can be no question that Hotchkiss knew or should have known that its policies and procedures were insufficient to protect students from abusive faculty by 1993. And yet Hotchkiss did not make any campus-wide changes besides finally removing Thorne-Thomsen. This was not sufficient. Smith continued to prey on students both in the locker room and in his apartment. In 1993, Smith drugged and raped a student in his apartment during a

---

[20] Ex. A, Locke Lord Report, at 14.

regular English tutoring session. *See Roe v. The Hotchkiss School*, No. 3:18-cv-01701, Dkt. 1 (D. Conn. Oct. 12, 2018). And in 1994-1995, Smith sexually abused Plaintiff Mark Moe before football games and in his apartment during English tutoring, as described below.

72.     A remarkable amount of the misconduct described above was widely known among administrators, faculty, and students at Hotchkiss when it was occurring (during Smith's tenure).  As with Smith himself, much of the inappropriate attention given by Thorne-Thomsen, Carlisle, Carlson, and Adult 1 to targeted students was open and obvious, occurring in public classrooms, dormitories, and dining halls. For example, the Locke Lord Report quoted one faculty member saying, "everyone on that campus knew" about Adult 1's behavior toward Student 19 in the 1980s.[21] These adults' sexual relationships with students were widely discussed too, with knowledge often spread via rumors and jokes. A common "joke" on campus about Dr. Gott was that if a girl went to Gott for any reason, he would ask her to remove her shirt. Hotchkiss administrators not only knew or should have known of these widespread rumors and jokes, but knew that several of them were proven true when they received direct reports of abuse by Thorne-Thomsen, Carlisle, Adult 1, and Gott. Learning the truth of these rumors should have led Hotchkiss to take more seriously the similar rumors about Smith (especially when White received the direct report about Smith).

73.     Upon information and belief, Hotchkiss did not report a single one of the instances of abuse listed above to law enforcement as required by Connecticut's mandatory reporting law.

---

[21] Ex. A, Locke Lord Report, at 24.

74.     Notably, among the many teachers that Hotchkiss allowed to sexually abuse its students in addition to Smith, several held similar roles to Smith at the same time as Smith. Carlisle, Carlson, and Damon White were English teachers; Carlson was a dorm parent; and DelPrete and Damon White coached the football team, and Thorne-Thomsen, Carlisle, and Faculty 1 coached other sports teams. Hotchkiss had direct reports of abuse by coaches DelPrete, Thorne-Thomsen, and Faculty 1, and knowledge was widespread of abuse by English teachers Carlisle and Carlson (and Smith). Nonetheless, Hotchkiss made no effort to recognize trends or respond to areas of high student risk such as the English department, sports coaches, and dorm parents, instead responding (if at all) to teacher misconduct as isolated events.

75.     In sum, Hotchkiss not only knew directly of Smith's abuse, but also should have known of risk trends implicating Smith from the extensive series of reports about abuse by other teachers during Smith's tenure. These reports should have made clear that Hotchkiss had a long-term, campus-wide problem resulting in a systemic failure to protect students from abusive faculty. If Hotchkiss had responded appropriately to its knowledge of the abuse by other faculty and adults on campus described above, such as by creating policies and practices to prevent students from being alone with faculty in inappropriate circumstances, especially at faculty's homes after hours, Plaintiff and the other proposed class members would not have been at heightened risk of abuse by Smith.

**C.      Hotchkiss Did Not Have Appropriate Policies or Procedures to Protect Students, But Instead Had a Culture of Covering Up Abuse and Protecting Abusers, Including Smith.**

76.     As the District of Connecticut in a prior case and the Hotchkiss-commissioned Locke Lord Report both concluded, Hotchkiss failed to have policies and procedures in place

2756010.10

that would have protected students from sexual abuse, and instead Hotchkiss prioritized

protecting its reputation and abusive faculty.

### 1.   Hotchkiss Had No (or Insufficient) Policies or Procedures for Preventing or Responding to Sexual Abuse During Smith's Tenure.

77.   Sexual misconduct policies were the norm at schools in the 1970s and afterward,

and it was highly inappropriate and dangerous for schools not to have any.

78.   Nonetheless, "Hotchkiss did not have formal rules, training and procedures

related to sexual misconduct between teachers and students," throughout much or all of Smith's

time at Hotchkiss. *Doe v. Hotchkiss Sch.*, No. 3:15-CV-160 (VAB), 2019 WL 1099027, at *8 (D.

Conn. Mar. 8, 2019). The District of Connecticut quoted sworn testimony by Hotchkiss officials

admitting that the school had no faculty training programs or written policies prohibiting sexual

contact with students from the 1970s through the 1990s. Hotchkiss also failed to instruct students

on how to report or recognize sexual misconduct. "In fact, Hotchkiss did not implement sexual

abuse policies until the late-1990s or early 2000s," at the very end of or after Smith's tenure. *Id.*

at *9. "Hotchkiss never instructed students on how to report or recognize sexual misconduct." *Id.*

79.   The policies, practices, and training Hotchkiss lacked included:

a.   Any policies or training for faculty like Smith appointed as dorm

supervisors, including how to supervise students in a dorm, how to care for and respond to

injuries, and how to respond to allegations of abuse, sexual or otherwise;

b.   Any policies or training regarding sexual misconduct, how to prevent it,

how to respond to it, and how to report;

c.   Any formal reporting mechanisms for sexual abuse;

d.     Any training on how to recognize inappropriate sexual conduct (for teachers or students);

e.     Any information on Connecticut's legal mandate that teachers with reasonable cause to suspect that a child under age 18 has suffered abuse, including sexual abuse, report the suspected abuse to law enforcement.

80.     Even when Hotchkiss recognized that a policy was important for protecting students from abuse, it failed to apply it to Smith. After Thorne-Thomsen's 1979 paid leave of absence, Headmaster Olsen permitted Thorne-Thomsen to return on the condition that Thorne-Thomsen no longer have students alone at his home (which Hotchkiss failed to enforce, resulting in additional abuse there later). But Hotchkiss did not impose that rule on other faculty, even though it knew (and should have known) that faculty residences were a primary site of abuse. Such a rule, properly enforced, could have prevented much devastating abuse committed by Smith against Plaintiff and proposed class members.

## 2.     Hotchkiss's Lack of Policies Reflect Institutional Betrayal.

81.     Hotchkiss's failure to implement and enforce policies and procedures for the prevention of, and proper response to, abuse of its patients exacerbates the trauma of the actual abuse. These failures reflect a pattern of "institutional betrayal," wrongdoings perpetrated by an institution including failure to prevent or respond supportively to wrongdoings by individuals (that include, physical, emotional, and sexual abuse).[22]

---

[22] Jennifer J. Freyd, *Institutional Betrayal and Institutional Courage*, https://dynamic.uoregon.edu/jjf/institutionalbetrayal/ (last visited May 26, 2021); *see also* Carly Parnitzke Smith & Jennifer J. Freyd, *Institutional Betrayal*, 69 AM. PSYCH. ASSOC. 575 (2014) (available at: https://pages.uoregon.edu/dynamic/jjf/articles/sf2014.pdf).

3.      **Hotchkiss's Failure to Adequately Respond to Reports of Abuse Demonstrates Its Culture of Accepting Abuse and Shielding Faculty.**

82.     The Locke Lord Report concluded that Hotchkiss "inadequately responded to sexual misconduct by faculty members for a variety of reasons, including: (a) a failure to be aware, and sensitive to, sexual misconduct generally; (b) a lack of awareness of the sexual misconduct that can occur on a co-educational campus; (c) a failure to document reports of troubling behavior and the failure to share this information from one head of school to the next; (d) a prioritization of the school's reputation and that of its faculty above the well-being of the individual students; and (e) the lack of resources and support for both concerned faculty and students who observed or experienced sexual misconduct."[23]

83.     The District of Connecticut recognized in a prior case that "Hotchkiss staff, however, were not receptive to teachers reporting sexual assault of students by teachers." *Doe v. Hotchkiss Sch.*, No. 3:15-CV-160 (VAB), 2019 WL 1099027, at *9 (D. Conn. Mar. 8, 2019).

84.     The District of Connecticut also found that "As an institution, Hotchkiss arguably failed to comply with state reporting requirements and investigate allegations of sexual abuse when they were reported to administrators." *Id.*

85.     Hotchkiss's actions in response to repeated reports of sexual abuse bear out these findings.

86.     Repeatedly, Hotchkiss responded to reports of faculty abuse by ignoring them entirely (as with multiple reports of Thorne-Thomsen). Sometimes Hotchkiss responded by talking to the teacher about the allegations, believing the teacher's denials, and not changing anything about the teacher's access to students or the school's policies (as with DelPrete and

---

[23] Ex. A, Locke Lord Report, at 26.

-30-

Gott). Hotchkiss allowed several teachers, including Smith, to continue in their roles at Hotchkiss for decades after receiving reports of abuse by those teachers.

87.     Worse, as described above, Hotchkiss actively suppressed and punished reports of abuse, without appropriately punishing the abusers.

      a.     After a student told Headmaster White in 1987 that Smith had drugged and raped him, Hotchkiss prevented the student from publicizing this information and expelled the student. By sharp contrast, Hotchkiss continued to employ Smith until 2000, including continuing to allow him to live in a student dormitory and work in the boys' locker room regularly massaging boys inappropriately.

      b.     When Stacks told Headmaster White that she had received photos of a teacher (Robinson) having sex with an incapacitated student, White told Stacks her first loyalty had to be to Hotchkiss, threatened to punish her if she told anyone (including instructing her not to fulfill her state-law mandatory reporting duties), and then fired her and tried to prevent her from getting work at peer schools. Hotchkiss permitted Robinson to keep working on campus and living in the student dorm for the rest of that school-year.

88.     Even when Hotchkiss did take action against faculty after reports of their abuse, and thus recognized that those faculty had committed misconduct, it demonstrated blithe disregard for the continuing threat posed by those faculty and failed to protect students from them in the future. This shows how Hotchkiss did not prioritize students' health and safety, in breach of its duties to its students. In addition to Smith and Robinson being permitted to remain on campus after reports of their abuse, Hotchkiss treated other teachers similarly:

      a.     After finally placing Thorne-Thomsen on a (paid) leave of absence in 1979, Hotchkiss permitted him to return for another 12 years, even though his pattern of

foreseeable misconduct with students continued unabated. The 1980 letter from Hotchkiss Headmaster Olsen to Thorne-Thomsen inviting him to return gave Thorne-Thomsen every benefit of the doubt and the students he abused none—crediting Thorne-Thomsen with "the most honorable . . . intentions" while suggesting a student victim needed to be brought "to heel."[24]

      b.      In 1970, a faculty member reported to then-Headmaster Olsen that Albert Sly had propositioned a male student for sex. Hotchkiss terminated Sly, but permitted Sly to regularly return to campus, and rehired him as a music teacher in 2008. Hotchkiss did nothing to prevent Sly from working with children again elsewhere (which he did). Hotchkiss also apparently did not alert the broader school community about Sly's conduct, because Hotchkiss Magazine published a positive article about Sly in 2014. After reading it, the same faculty member who had reported Sly in 1970 contacted then-Headmaster Hicks, who met with Sly to discuss the allegations. Sly said "I guess I drank too much, they said I raped him, whatever, I guess I raped him."

      c.      In 2010, a student emailed then-Headmaster Malcolm McKenzie and other Hotchkiss administrators about the regular sexual abuse she suffered at the hands of Damon White in the early 1980s.[25] Damon White, the son of former Headmaster Arthur White, was an English teacher and a coach of the football and hockey teams (overlapping with Smith in both ways, further demonstrating the concentration of abuse in these departments and teams if Hotchkiss had cared to investigate). Student 12's allegations of abuse echoed many of the other stories: Damon White repeatedly compelled her to give him oral sex in his apartment during study hall. When Hotchkiss received this report about Damon White in 2010, he was still

---

[24] Ex. A, Locke Lord Report, at App'x C.
[25] The Locke Lord Report refers to this student as Student 12.

teaching there. Hotchkiss retained a law firm to investigate, but it did not issue a report until April 2012, when it concluded that he did commit sexual misconduct. Rather than immediately firing Damon White, Hotchkiss allowed him to continue teaching until the end of the school year and then resign. He went on to teach at another private school. Hotchkiss demonstrated little interest in protecting its own students and zero interest in protecting others from a confirmed sexual abuser.

89.     Even in recent years, Hotchkiss has failed to reckon with its long history of abuse or recognize that praising abusive teachers could retraumatize the students Hotchkiss had permitted teachers to abuse. For example, in 2020, Bob Gould, then the chair of the board of Hotchkiss, publicly praised Smith even as Hotchkiss was litigating the lawsuit related to Smith's 1987 rape of a student.[26]

90.     Hotchkiss also failed to demonstrate any interest in uncovering abuse on its campus, never investigating beyond the individual reports it did receive (if those). Simple investigations would have allowed Hotchkiss to discover and prevent significant abuse. For example, when Hotchkiss finally suspended Thorne-Thomsen in 1979 for misconduct with Student 3, Hotchkiss failed to identify or address that Thorne-Thomsen was simultaneously abusing Student 4 (and continued to do so while on suspension), or that Carlisle was *also* simultaneously abusing Student 4. Nor did Hotchkiss respond to any reported instances of abuse during Smith's tenure by addressing anyone beyond the individual faculty member involved in the report. Hotchkiss admitted this expressly in Headmaster Oden's 1992 letter to Student 4, stating that "[n]o similar investigation of any other current faculty member has been conducted"

---

[26] As of the time of filing, these comments remain available to view on a video on Hotchkiss's website: https://www.hotchkiss.org/our-school/governance/trustee-livestream.

besides the one against Thorne-Thomsen. Instead, in "every" incident reported the Headmaster had simply "spoken with accusers and accused, and the issue has been resolved." That mere talking-to and lack of investigation obviously did not resolve Hotchkiss's rampant abuse issues.

91.     If Hotchkiss had had the appropriate policies in place, instead of a retaliatory culture that had a chilling effect on reports of sexual misconduct, Hotchkiss would have been aware of even more abuse than it already was, and would have prevented the abuse against Plaintiff and other proposed class members. Instead, Hotchkiss willfully blinded itself so it would not learn of sexual misconduct—or ignored and suppressed such information when it did learn of it.

### 4.     Hotchkiss's Policy Failures Were Outside the Norm and Suppressed Reporting of Abuse.

92.     Abuse is particularly pervasive and destructive in school settings because students are taught to trust teachers. Schools are also a place where teachers are more often believed than are students and in which there is a power and status differential that privileges teachers and other educators.[27]

93.     This was especially true at Hotchkiss, which had a strong protective culture that discouraged reporting and actively retaliated against reporters.

94.     Hotchkiss had no policy for identifying or reporting sexual misconduct during Smith's tenure. Sexual misconduct policies were the norm at schools in the 1970s as well as

---

[27] *See* Ex. B, Educator Sexual Misconduct: A Synthesis of Existing Literature, Prepared for the U.S. Department of Education Office of the Under Secretary Policy and Program Studies Service by Charol Shakeshaft, U.S. DEPARTMENT OF EDUCATION DOC # 2004-09 (2004).

today, and for a school not to have one was highly inappropriate. Having no policy for reporting

sends a message of discouragement and allows retaliation against reporters to flourish.[28]

95.     According to Charol Shakeshaft, a leading authority on school sexual abuse, most

reports of educator sexual misconduct come to the attention of school officials in five ways:

formal complaints, informal complaints, observed abuse, observed suspicious behaviors, or

rumors and/or anonymous reports. Formal and informal complaints are most likely to originate

from victims or parents of victims. Seldom is the abuse reported by another teacher, even if the

child has told the teacher. While formal reports might not be made in school, informal

information is passed on through rumor, innuendo, and jokes.[29]

96.     Several studies estimate that only about 6 percent of all children report sexual

abuse by an adult to someone who can do something about it. The other 94 percent do not tell

anyone or talk only to a friend. (And they often swear their friend to secrecy.)[30]

97.     Sadly, when alleged misconduct is reported, the majority of complaints are

ignored or disbelieved. But the most common reason that students don't report educator sexual

misconduct is fear that they won't be believed. And students have good reasons for that fear:

Because of the power differential, the reputation difference between the educator and the child,

or the mindset that children are untruthful, many reports by children are ignored or given

minimal attention (or worse, as at Hotchkiss, punished). Other students note this lack of response

or punishment and conclude that abusive teachers (or coaches or administrators) cannot be

stopped. After all, if the School will not act, what can a mere student do?[31]

---

[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.*

98.     Dr. Shakeshaft's analysis aptly describes Hotchkiss's behavior related to Smith and other abusive teachers, and explains why students would feel betrayed, defeated, and traumatized by Hotchkiss's failures to protect them.

**D.      Hotchkiss Permitted Roy Smith to Abuse Plaintiff**

**1.      Roy Smith's Abuse of Plaintiff Mark Moe**

99.     Plaintiff attended Hotchkiss as a boarding student in the 1990s, beginning when he was 16 years old.

100.     Plaintiff was abused by Roy Smith through each of Smith's paradigmatic methods. First, Plaintiff was regularly groped by Smith in the training room before and after football games. Second, Plaintiff was assaulted in Smith's on-campus apartment during required English "tutoring" sessions.

**a.      Roy Smith Ogled and Groped Plaintiff Under the Guise of Athletic Training**

101.     First, as with other students on teams for which Smith served as athletic trainer over three decades, Hotchkiss forced Plaintiff to undress, shower, and dress in view of Smith's training room. In other words, Hotchkiss enabled Smith to ogle and leer at Plaintiff and other underage student-athletes like him while nude.

102.     Like other student-athletes who had injuries or other conditions, Hotchkiss told Plaintiff to "go see Uncle." In doing so Hotchkiss enabled Smith to inappropriately touch, fondle, and grope Plaintiff under the guise of treatment. Due to certain issues with his hips, Plaintiff had to visit Smith in his training room before and after every football practice and games every day. Smith would tape Plaintiff's hips, and in the course of doing so would grope Plaintiff's upper thigh, legs, and hip, across his upper pelvis area, around the other hip, across the small of his back, and down through the inner thigh on Plaintiff's other leg. Smith also touched

-36-

Plaintiff's penis and testicles with his hand or even his face. During Plaintiff's senior year, Smith

sexually assaulted Plaintiff more than fifty times under the guise of necessary medical treatment.

103.    Smith's abuse of student-athletes happened in a training room right off the boys'

locker room that had no door, so the abuse regularly occurred in full view of other students and

coaches. As it had for more than two decades prior and years afterward, Hotchkiss simply

allowed this abuse to occur out in the open, leading students to believe it was just a normal

prerequisite to playing sports.

104.    In addition to the widespread knowledge of Smith's mistreatment of students and

the direct reports of Smith's abuse to Hotchkiss faculty and administrators, multiple Hotchkiss

teachers knew or should have known of Smith's actions against Plaintiff personally. The other

faculty coaches of the football team—Rick DelPrete and Damon White—were constantly around

the locker room at the same time as Smith, and were generally responsible for permitting Smith

to play his role of unlicensed athletic trainer. These faculty should have acted to stop Smith's

abuse or report it.

### b.      Roy Smith Groped and Abused Plaintiff Under the Guise of English Tutoring

105.    Second, Roy Smith was also Plaintiff's English teacher. As he did with many

other students, Smith forced Plaintiff to his on-campus apartment under the guise of "tutoring"

Plaintiff and touched him inappropriately during those meetings. The buildup to abuse for

Plaintiff matched that of other students. As with others, Smith insulted Plaintiff's writing and

insisted he needed tutoring. Plaintiff was a child and believed Smith was there to help him.

Plaintiff visited Smith's apartment at least six times. As other students have reported as well,

Plaintiff remembers Smith directing him to sit on the couch, Smith closing his apartment door,

and then Smith sitting so close to Plaintiff that he was practically on Plaintiff's lap. Smith would then inappropriately touch Plaintiff's upper thigh, shoulders, and lower back while reviewing papers. During one session with Smith at his apartment, Smith offered Plaintiff tea, and Plaintiff's memory becomes hazy and goes black. This matches the experience of numerous other students who Smith drugged before sexually abusing. The next thing Plaintiff remembers he was leaving Smith's apartment and running to find his girlfriend for comfort. Plaintiff contemporaneously told at least one other student about his experiences at Smith's apartment.

### 2. Impacts of Abuse on Plaintiff Mark Moe

106. Hotchkiss and Smith's abuse caused multiple layers of injury to Plaintiff. First, there was the immediate, direct physical harm caused by Smith's multiple forms of inappropriate touching and sexual abuse. Second, there were the physical, psychological, emotional, and social harms caused by Smith's abuse and Hotchkiss's failure to protect its students. When Plaintiff began attending Hotchkiss, he was a trusting, happy 16-year-old boy who liked people. After his abuse by Smith, Plaintiff was angry, distrusting, and suffering from anxiety and depression. Plaintiff has had difficulty trusting people since then, and it has damaged his relationships with family, friends, and romantic partners. Plaintiff feels responsible that he did not recognize and report his abuse by Smith (even though it was Hotchkiss that failed its duty to protect him and report its knowledge of prior accusations against Smith to police). Plaintiff's experience of Smith's abuse and Hotchkiss's betrayal has led him to feel an inner sense of not being worthy, as if he does not deserve a good life.

107. After graduating from Hotchkiss, Plaintiff began to abuse drugs in college, and his substance abuse increased as he entered a career in finance. Ultimately his drug use caused

-38-

him to lose his job and get knocked off his career and life trajectory. Plaintiff attended four years of therapy for related issues.

108.    In 2023, Plaintiff began attending weekly therapy sessions specifically to address trauma and other impacts resulting from his abuse at Hotchkiss. This treatment has cost Plaintiff $150 per week out of pocket, and is ongoing.

### 3.    Plaintiff's Injuries Could Not Have Happened If Hotchkiss Had Not Given Roy Smith Access And Opportunity.

109.    The Hotchkiss School's affirmative acts created, and exposed Plaintiff and class members to, a known high degree of risk of harm. These acts by the School include: housing Smith in a boys' dormitory; giving Smith unfettered access to and authority over boys in that dormitory; allowing Smith unsupervised access to vulnerable young children, including permitting him to regularly bring boys alone into his private residence at night; allowing Smith to give pills to children without any medical credentials; allowing Smith to work in the athletics program and locker room areas where he was able to touch and leer at the naked and partially-clothed bodies of boys; and requiring students to see Smith for "treatment" in order to practice or play sports. In addition, Hotchkiss failed to take any action to protect students from Smith after direct reports of Smith drugging and raping students. This institutional betrayal by Hotchkiss exacerbated the injuries to Plaintiff and the proposed class.

110.    Without the access and opportunity Hotchkiss gave Smith, Plaintiff and proposed class members here would not have been at heightened risk of abuse, and would not have suffered the abuse they did. This access and opportunity—the freedom to prey on young boys—was knowingly afforded to Smith by the administrators and faculty of Hotchkiss.

-39-

111.    Dorms were run by faculty designated as dorm heads or "dorm parents" (further emphasizing the *in loco parentis* role of Hotchkiss and its faculty). Hotchkiss designated Roy Smith as dorm head after he had raped multiple students in his dorm apartment. Each dorm was the dorm head's fiefdom, and dorm heads were free to run the dorm however they wished. There were no rules or guidelines from the administration to faculty on how to run the dorms. This, too, allowed predators like Smith access to children at all hours and ample opportunity to groom and abuse children in their own homes. Displaying classic predatory behavior, Smith capitalized on this access and opportunity.

## V.    PLAINTIFF'S CLAIMS ARE TIMELY UNDER CONNECTICUT STATUTE AND DUE TO HOTCHKISS'S FRAUDULENT CONCEALMENT

112.    This Complaint is timely filed pursuant to Connecticut General Statutes § 52-577d because (a) Hotchkiss's negligent acts and omissions occurred while Plaintiff was a minor, (b) this action is brought within 30 years from the date Plaintiff attained the age of majority, and (c) this action seeks damages caused by sexual abuse, sexual exploitation, and sexual assault.

113.    Under Connecticut law, statutes of limitations are tolled when "any person, liable to an action by another, fraudulently conceals from [the other person] the existence of the cause of such action." Conn. Gen. Stat. § 52-595. Where such fraudulent concealment occurs, a cause of action accrue only once "the person entitled to sue thereon first discovers its existence." *Id.*

114.    Hotchkiss, through its employees, agents, and representatives, fraudulently concealed the existence of Plaintiff's and class members' claims by concealing from Plaintiff and class members that Hotchkiss and its employees, agents, and representatives were aware of the risk of faculty sexual abuse by Smith and other faculty in similar situations, and yet did not

-40-

take sufficient action to stop it. Hotchkiss thereafter concealed from Plaintiff and class members that it was an entity "liable to an action by another."

      115.   Hotchkiss's acts constituting fraudulent concealment included (but was not limited to):

      a.     Treating Smith's conduct as if acceptable and non-abusive;

      b.     Refusing to terminate Smith and thus validated him through continued employment as a faculty member through 2000;

      c.     Ignoring, refusing, and failing to inquire, question, and investigate complaints and take action regarding Smith's reported abuse;

      d.     Failing to inform Plaintiff, class members, or the public about reports of abuse by Smith and other teachers in similar circumstances; and

      e.     Suppressing and retaliating against those who did report Smith's misconduct.

      f.     Hotchkiss did not publicly acknowledge sexual abuse by Smith until the 2018 Locke Lord Report, which mentioned but did not investigate Smith. Even now Hotchkiss has not revealed all its information about Smith's abuse.

      116.   Plaintiff and class members were particularly susceptible to believing Hotchkiss's representations because, among other reasons:

      a.     Plaintiff and class members were young and inexperienced at the time of the abuse;

      b.     Hotchkiss owed them a duty and promised to keep them safe;

      c.     Plaintiff and class members trusted Smith and Hotchkiss to look out for their best interests;

      d.     Plaintiff and class members trusted Smith in particular due to the positions of trust and authority granted him by Hotchkiss.

      117.   Hotchkiss knew Plaintiff and class members were particularly susceptible to believing Hotchkiss's representations for these reasons.

118.    Because Hotchkiss had a fiduciary duty to Plaintiff and class members, the failure to disclose material information is also fraudulent.

119.    At all times pertinent to this action, Smith and any other athletic trainers, employees, staff, managers, supervisors, coaches, and directors of Hotchkiss were agents, apparent agents, servants, and employees of Hotchkiss and operated within the scope of their employment and their own fraudulent concealment is imputed to Hotchkiss.

120.    Hotchkiss is equitably estopped from relying upon a statute of limitations defense because of its gross negligence and silence as well as its active and deliberate efforts to deceive Plaintiff and the class members and to conceal its unlawful and grossly negligent conduct.

121.    Plaintiff and class members' claims should be equitably tolled because any alleged failure to meet any deadline arose from Hotchkiss's concealment of material facts relevant to Smith's misconduct for decades.

## VI.    CLASS ALLEGATIONS

122.    Plaintiff brings this action pursuant to Rules 23(a) and (c)(4) of the Federal Rules of Civil Procedure on behalf of himself and the following Class:

> All male Hotchkiss students who were student-athletes on a Hotchkiss sports team for which Roy Smith served as an athletic trainer, and/or who visited Roy Smith's on-campus apartment for "tutoring."

123.    Plaintiff seeks to resolve certain issues on a classwide basis, including:

a.    Whether Hotchkiss owed a duty under Connecticut negligence law to Plaintiff and class members as students to warn and protect them from harm, including sexual abuse by Hotchkiss faculty;

-42-

b.      Whether Hotchkiss owed a fiduciary duty under Connecticut law to Plaintiffs and class members to warn and protect them from harm, including sexual abuse by Hotchkiss faculty;

c.      Whether Hotchkiss breached its duty under Connecticut negligence law; and

d.      Whether Hotchkiss breached its fiduciary duty under Connecticut law; and

e.      Whether Hotchkiss's conduct related to Roy Smith was unreasonable and created an unreasonable risk of foreseeable emotional harm.

124.    All elements of Rule 23 are satisfied, such that certification of these two common issues for classwide treatment under Rule 23(c)(4) is appropriate.

125.    The Class consists of far more alumni than could practicably be joined in this action, satisfying Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual members are ascertainable through records maintained by Hotchkiss and class member self-identification.

126.    Each of the issues Plaintiff seeks to certify for classwide resolution have common answers. Rule 23(a)(2) is satisfied.

127.    Plaintiff's claims are typical of the Class. Plaintiff and class members' claims are based on the same legal theories and arise from the same unlawful events, including Hotchkiss's failure to implement and enforce appropriate policies and procedures to prevent and properly respond to sexual harassment and assault; and Hotchkiss's culture of covering up for and protecting abusers instead of protecting its students. Rule 23(a)(3) is satisfied.

128.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff's interests are not antagonistic to the interests of other members of the class, and

-43-

Plaintiff's counsel are qualified and experienced at complex litigations and class actions, including those involving sexual assault. *See In Re USC Student Health Center Litigation*, No. 2:18-cv-04258-SVW (C.D. Cal.). Plaintiff and their counsel are committed to vigorously prosecuting this action on behalf of the other respective class members, and Plaintiff's counsel has the financial resources to do so. Rule 23(a)(4) is satisfied.

129.     The Rule 23(b)(3) requirements of predominance and superiority do not apply to this action seeking certification under Rule 23(c)(4). Even if they did, they would be satisfied. Certification of only common issues necessarily means that common questions would predominate among the certified issues. Resolving these issues on a classwide basis would be superior to the alternatives. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. If Plaintiff prevails and proves the common issues, class members would have the opportunity to rely on those rulings and bring simpler follow-on actions to establish their individual damages caused by Hotchkiss and Smith.

**COUNT 1**
**BREACH OF FIDUCIARY DUTY**
**(On behalf of Plaintiff and the Class)**

130.     Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

131.     A fiduciary relationship existed between Hotchkiss and Plaintiff and each class member, which gave rise to (a) a duty of loyalty on the part of Hotchkiss to Plaintiff and the Class; (b) an obligation on the part of Hotchkiss to act in the best interests of Plaintiff and the

-44-

Class; and (c) an obligation on the part of Hotchkiss to act in good faith in any manner relating to Plaintiff and the Class.

132.    Hotchkiss assumed responsibility for, among other things, its students' protection, safety, and well-being.

133.    Hotchkiss promised Plaintiff and the Class that the health and welfare of its students was the School's highest priority.

134.    Hotchkiss accepted a duty to Plaintiff and the Class to do everything within its power to protect them from sexual abuse by other students and by the School's faculty.

135.    Hotchkiss agreed that it had a duty and responsibility to keep the children in its care and custody safe from harm.

136.    At all relevant times, there was a special relationship between Plaintiff and other class members and Hotchkiss such that an ordinary party in Hotchkiss' position knew or should have known of the general harm suffered by Plaintiff and the Class. Within that special relationship, Hotchkiss had an affirmative duty to protect Plaintiff and other class members and warn them of harms that Hotchkiss should have reasonably anticipated.

137.    At all relevant times, there was a special relationship between class members and Hotchkiss such that an ordinary party in Hotchkiss' position knew or should have known of the general harm suffered by class members. Within that special relationship, Hotchkiss had an affirmative duty to protect the Class and warn it of harms that Hotchkiss should have reasonably anticipated.

138.    The trust, superior knowledge, and superior expertise of Hotchkiss established a fiduciary relationship between Plaintiff and Hotchkiss, as well as between the Class and Hotchkiss.

139.    Because Plaintiff and class members lived on campus at Hotchkiss, where Hotchkiss controlled the property, Hotchkiss was in a dominant position compared to Plaintiff and the Class while they were enrolled at Hotchkiss.

140.    Notwithstanding these duties, responsibilities, and promises to keep Plaintiff and the Class safe from harm, at the time that Plaintiff and each class member entered and attended Hotchkiss, the School and its teachers and administrators knew or should have known that Smith posed a risk to the minor boys in his care.

141.    At the time that Hotchkiss exposed Plaintiff and the Class to "Uncle Roy" Smith, it was on actual and constructive notice that Smith desired young boys and had acted on his desires in the past by engaging young boys in sexualized conversation, by touching young boys in inappropriate and sexual ways, and by drugging and assaulting them.

142.    Hotchkiss's affirmative acts—including housing Smith in and giving him unfettered access to and authority over a boys' dormitory, allowing him unsupervised access to vulnerable young children, and allowing him to work in the athletics program and locker room areas where he was able to touch and leer at the naked and partially-clothed bodies of young boys—created and exposed Plaintiff and the Class to a known high degree of risk of harm.

143.    Hotchkiss was on actual and constructive notice of the gravity of the harm that would result if Smith molested one or more of the boys in the School's care and custody.

144.    Hotchkiss knew that no other person or entity would assume the responsibility for preventing Smith from molesting young boys.

145.    Thus, Hotchkiss created a situation that it knew and should have known was likely to be dangerous to Plaintiff and the Class.

-46-

2756010.10

146.    Despite having created the dangerous situation, Hotchkiss failed and refused to take appropriate precautions against the risk of harm.

       a.    Hotchkiss, by commission and omission, allowed and tolerated sexual assaults and humiliation;

       b.    Hotchkiss, by commission and omission, failed and refused to train and supervise school teachers and other School employees, including "Uncle Roy" Smith;

       c.    Hotchkiss hired teachers and other employees, including Smith, despite actual or constructive knowledge of their propensity and desire to molest young boys;

       d.    Hotchkiss retained teachers and other employees, including Smith, despite actual or constructive knowledge of their propensity and desire to molest young boys; and

       e.    Hotchkiss failed to warn Plaintiff and the Class of the risks of harm to which they were subjected while attending Hotchkiss.

147.    Hotchkiss advanced its own interests to the detriment of Plaintiff and the Class.

**<u>Allegations Specific to Plaintiff</u>**

148.    As a result of the foregoing, Plaintiff has sustained damages.

149.    As a result of Hotchkiss's acts and omissions, Plaintiff's ability to engage in normal life's activities has been impaired, potentially permanently, and he has been and will be unable to lead and enjoy a normal life.

150.    The harm inflicted on Plaintiff as a vulnerable boy at Hotchkiss has adversely affected his ability to enter into and maintain lasting meaningful relationships with others.

151.    Plaintiff's ability to maintain intimate physical, sexual, and emotional relationships with other human beings has been damaged.

-47-

152.     As a result of Hotchkiss's breach of fiduciary duty, Plaintiff has sustained physical pain and suffering.

153.     As a result of Hotchkiss's breach of fiduciary duty, Plaintiff has sustained, and will over the course of his lifetime continue to suffer, severe emotional distress and mental pain and anguish.

154.     Hotchkiss owed Plaintiff a duty of care, it breached that duty, its breach caused Plaintiff to be assaulted and molested, and Plaintiff suffered damages as a result.

155.     Plaintiff's damages were proximately caused by Hotchkiss's breach of its fiduciary duty to him.

### COUNT 2
### NEGLIGENCE
### (On behalf of Plaintiff and the Class)

156.     Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

157.     Hotchkiss assumed responsibility for, among other things, its students' protection, safety, and well-being.

158.     Hotchkiss had and accepted a duty to Plaintiff and the Class to take all reasonable precautions to ensure their safety and welfare as children entrusted to Hotchkiss's custody. Hotchkiss also accepted a duty to protect against harm that it anticipated or reasonably should have anticipated.

159.     Hotchkiss agreed that it had a duty and responsibility to keep the children in its care and custody safe from harm.

160.     Hotchkiss owed a duty to Plaintiff and the Class to exercise reasonable care in ensuring its students are educated in a safe environment free from unreasonable risk of harm.

161.    At all relevant times, there was a special relationship between Plaintiff and other class members and Hotchkiss such that an ordinary party in Hotchkiss' position knew or should have known of the general harm suffered by Plaintiff and the Class. Within that special relationship, Hotchkiss had an affirmative duty to protect Plaintiff and class members and warn them of harms that Hotchkiss should have reasonably anticipated.

162.    At all relevant times, there was a special relationship between class members and Hotchkiss such that an ordinary party in Hotchkiss' position knew or should have known of the general harm suffered by class members. Within that special relationship, Hotchkiss had an affirmative duty to protect the Class and warn it of harms that Hotchkiss should have reasonably anticipated.

163.    Hotchkiss acted with a lack of due care towards Plaintiff and the Class through its acts and omissions, including:

      a.    housing Smith in and giving him unfettered access to and authority over a boys' dormitory; allowing Smith unsupervised access to young children;

      b.    allowing Smith to work in the athletics program and locker room areas where he was able to touch and leer at the naked and partially-clothed bodies of young boys;

      c.    failing and/or refusing to train and supervise school teachers and other School employees, including "Uncle Roy" Smith;

      d.    failing and/or refusing to take appropriate precautions against the high risk of harm to students posed by Smith;

      e.    tolerating sexual assaults and humiliation;

      f.    retaining teachers and other employees, including Smith, despite actual or constructive knowledge of their propensity and desire to molest young boys; and

-49-

g.      failing to warn Plaintiff and the Class of the risks of harm to which they were subjected while attending Hotchkiss;

h.      and suppressing and punishing reports of abuse by Smith and other faculty in similar situations.

164.   By failing to exercise ordinary care through their acts and omissions, Hotchkiss caused foreseeable harm to Plaintiff and the Class.

### Allegations Specific to Plaintiff

165.   As a result of Hotchkiss's acts and omissions, Plaintiff's ability to engage in normal life's activities has been impaired, potentially permanently, and he has been and will be unable to lead and enjoy a normal life.

166.   The harm inflicted on Plaintiff as a vulnerable boy at Hotchkiss has adversely affected his ability to enter into and maintain lasting meaningful relationships with others.

167.   As a result of Hotchkiss's negligence, Plaintiff has sustained physical pain and suffering.

168.   As a result of Hotchkiss's negligence, Plaintiff has sustained, and will over the course of his lifetime continue to suffer, severe emotional distress and mental pain and anguish.

169.   Plaintiff's injuries and damages were caused by the negligence of Hotchkiss, its teachers, administrators, employees and agents, for whose negligence Hotchkiss is liable.

170.   Hotchkiss owed Plaintiff a duty of care, it breached that duty, its breach caused Plaintiff to be assaulted and molested, and Plaintiff suffered damages as a result.

### COUNT 3
### NEGLIGENT RETENTION
**(On behalf of Plaintiffs and the Class)**

171.   Plaintiff incorporates by reference all prior paragraphs as if set forth in full herein.

-50-

172.     At all relevant times, Hotchkiss was required to exercise reasonable care in the hiring, supervision, and continued retention of all employees staffed at its facilities.

173.     As detailed above, Hotchkiss knew or should have known Smith was unfit for his positions. Smith's unfitness was evident, among other reasons, because he desired young boys and had acted on his desires in the past by engaging young boys in sexualized conversation, by touching young boys in inappropriate and sexual ways, and by drugging and assaulting them.

174.     Despite this misconduct, Hotchkiss failed to implement procedures for evaluating employee misconduct, evidenced by Roy Smith's repeated departure from institutional norms.

175.     Despite Hotchkiss's actual and/or constructive knowledge of Roy Smith abusing and assaulting Plaintiff and the Class, Hotchkiss retained Roy Smith for decades. Because of Hotchkiss's breach of duty to take action to prevent reasonably foreseeable harm by its employee, Plaintiff and the Class were grievously harm as described above.

### COUNT 4
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
#### (On behalf of Plaintiff and the Class)

176.     Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

177.     Hotchkiss's acts and omissions as described herein constitute the negligent infliction of emotional distress.

178.     Hotchkiss acted negligently towards Plaintiff and the Class, as described herein.

179.     Hotchkiss's acts and omissions related to Roy Smith described herein were unreasonable.

180.     Hotchkiss's acts and omissions related to Roy Smith described herein created an unreasonable risk of foreseeable emotional harm.

-51-

181.   Hotchkiss could and should have foreseen that its acts and omissions related to Roy Smith described herein would likely cause emotional distress that in turn would likely lead to illness or bodily harm. Among other such acts and omissions:

a.   Before and during the abuse against Plaintiffs and class members, Hotchkiss knew or should have known about sexual abuse by faculty against students, including by Roy Smith specifically.

b.   Hotchkiss tolerated this abuse, created a culture of protecting abusers, failed to sufficiently act when students, teachers, parents, and alumni reported abuse, and punished students and teachers who did report abuse.

c.   Hotchkiss failed to institute anti-sexual abuse policies or follow state reporting requirements of sexual assault, and failed to instruct students on how to report or recognize sexual misconduct.

182.   Hotchkiss's negligent conduct created an unreasonable risk of physical harm, which caused Plaintiff and the Class to be in fear of their safety.

183.   Hotchkiss's negligence placed Plaintiff and class members in the zone of danger of physical impact or injury and resulted in Plaintiff and class members suffering actual injury.

184.   Plaintiff and the Class suffered and continue to suffer severe emotional distress as a result of Hotchkiss's negligent conduct. This resulted in physical consequences, illness, and/or bodily harm, as described above.

185.   Hotchkiss's conduct was the cause of these damages.

186.   Moreover, Hotchkiss's lack of and/or failure to enforce adequate policies and procedures for the prevention of, and proper response to, sexual abuse of its students is an institutional betrayal that exacerbates and amplifies trauma suffered by Plaintiff and the Class.

## COUNT 5
## RECKLESSNESS
### (On behalf of Plaintiff and the Class)

187.     Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

188.     Hotchkiss, acting through its administrators, teachers, and staff, was consciously aware of the fact that it created a substantial risks to Plaintiff and the Class.

189.     Notwithstanding Hotchkiss's conscious awareness of the risk to Plaintiff and the Class, Hotchkiss failed to take necessary and appropriate steps to reduce or eliminate the risk.

190.     Notwithstanding Hotchkiss's conscious awareness of the risks to Plaintiff and the Class, Hotchkiss took affirmative steps to exacerbate the risks and to make harm and injury to Plaintiff and the Class more likely.

191.     The injuries suffered by Plaintiff and the Class described above were caused by the reckless or callous indifference, and/or the wanton misconduct, of Hotchkiss.

## COUNT 6
## VICARIOUS LIABILITY
### (On behalf of Plaintiffs and the Class)

192.     Plaintiff incorporates by reference all prior paragraphs as if set forth in full herein.

193.     Hotchkiss is vicariously liable for tortious misconduct through *respondeat superior*, negligent supervision, retention and hiring, and through enabling Smith's misconduct.

194.     Smith acted within their scope of his employment when engaging in the misconduct described herein such that Hotchkiss is vicariously liable for his conduct.

195.     Smith used his position as a Hotchkiss employee to engage in the misconduct described herein, such that Hotchkiss is vicariously liable for his conduct.

-53-

196.    But for his employment at Hotchkiss, Smith would not have been in unsupervised situations with Plaintiff and the Class. Additionally, Smith's responsibilities as a Hotchkiss employee enabled him to engage in the misconduct described herein.

197.    Smith took advantage of his authority and responsibilities at Hotchkiss to abuse Plaintiff and the Class, including touching them inappropriately.

198.    Hotchkiss ratified Smith's abusive conduct towards Plaintiff and the Class by failing to discipline, take corrective action, and/or report the misconduct. For decades, Hotchkiss sanctioned this culture of abusive behavior by its employees, as described above.

199.    These tortious acts were also foreseeable, as Hotchkiss was aware of repeated incidents of sexual, physical, and emotional abuse and assault by Smith. These repeated instances of misconduct should have alerted Hotchkiss that Smith and other staff members were abusing students.

200.    As a direct and proximate result of Smith's misconduct, Plaintiff and the Class suffered injuries as described herein.

## II.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter a judgment on his behalf and against Hotchkiss, and further grant the following relief:

A.    Award Plaintiff compensatory damages, punitive damages, pain and suffering, pre-judgment interest, and any other relief to which he is entitled under the law with respect to his individual claims;

B.    Certify the proposed Class and Issues pursuant to Rules 23(a) and 23(c)(4) of the Federal Rules of Civil Procedure;

-54-

C.      Designate Plaintiff as representative of the proposed Class and Plaintiff's counsel

as Class counsel;

D.      Award appropriate injunctive relief;

E.      Award Plaintiff and the Class costs and attorneys' fees; and

F.      Award to the Plaintiff and the Class for such other and further relief as the Court

deems just and proper.


Dated: November 6, 2023           */s/ Glenn A. Duhl*_____

Glenn A. Duhl #03644
gduhl@zcclawfirm.com
Zangari Cohn Cuthbertson Duhl & Grello P.C.
59 Elm Street, Suite 400
New Haven, CT 06510
Telephone: (203) 789-0001
Facsimile: (203) 782-2766

Annika K. Martin (*pro hac vice* motion forthcoming)
akmartin@lchb.com
Avery S. Halfon (*pro hac vice* motion forthcoming)
ahalfon@lchb.com
Patrick I. Andrews (*pro hac vice* motion forthcoming)
pandrews@lchb.com
Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

*Attorneys for Plaintiff Mark Moe and the Proposed Class*

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARK MOE,

     Plaintiff,

          -against-

THE HOTCHKISS SCHOOL,

     Defendant.

Civil Action No.: 3:23-cv-1460

## CLAIM FOR JURY TRIAL

Plaintiff, through counsel, claims this matter for trial by jury.

Dated: November 6, 2023      /s/ Glenn A. Duhl

Glenn A. Duhl #03644
gduhl@zcclawfirm.com
Zangari Cohn Cuthbertson Duhl & Grello P.C.
59 Elm Street, Suite 400
New Haven, CT 06510
Telephone: (203) 789-0001
Facsimile: (203) 782-2766

Annika K. Martin (*pro hac vice* motion forthcoming)
akmartin@lchb.com
Avery S. Halfon (*pro hac vice* motion forthcoming)
ahalfon@lchb.com
Patrick I. Andrews (*pro hac vice* motion forthcoming)
pandrews@lchb.com
Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

*Attorneys for Plaintiff Mark Moe and the Proposed Class*

2756010.10